## Interstate Coal Company v. Molner.

(Decided October 30, 1912.)

### Appeal from Knox Circuit Court.

1. Master and Servant—Mine Owner—Duty of—Diligence.—It is the duty of a mine owner to exercise ordinary care to provide a reasonably safe place in which his employe may perform his work, and he must use diligence to keep this place in a reasonably safe condition, so that the servant may not be exposed to unnecessary risk; and this diligence must be commensurate with the character of the service required, and with the dangers that a reasonably prudent man would apprehend under the circumstances of each particular case.

2. Master and Servant—Mine Owner—Degree of Care Required of Miner.—It is the duty of the miner to exercise that degree of care which is commensurate with the character of his occupation, which a reasonably prudent person would use, under like circumstances, in order to protect himself from injury; and if he fails to exercise this care, he cannot recover of the master for an injury to which his own negligence has contributed, even though the master has failed to exercise due care on his part. He cannot recklessly expose himself to a known danger, and which an ordinarily prudent and intelligent man would, in his station, have apprehended, and then recover of the master for the injury which his own carelessness caused.

3. Master and Servant—Dangerous Condition of Mine Roof.—If the dangerous condition of the roof of the mine, at the time and place

of the accident, was so threatening and imminent that it presented a monitory and cautionary significance and warning, which one could not have overlooked in the exercise of ordinary care, and the miner continued to work in such a place, and was injured while so working, he was guilty of contributory negligence, and cannot recover.

4. Master and Servant—Character of Notice Servant Charged With—Ordinary Care:—A servant is chargeable with actual notice of every fact that he would have known, had he exercised ordinary care to keep himself informed as to the matters concerning which it was his duty to inquire; and especially should this rule be applied where the servant's action is founded upon the assumption that the master ought to have known of something which he actually did not know.

5. Master and Servant—Defective Condition of Mine Roof—Assumption of Risk.—Where a miner knew of the defective condition of the roof, or where its defective condition was so obvious that he could have known of it by the exercise of ordinary care on his part, he assumes the risk of injury arising from such defect.

P. D. BLACK and BLACK, GOLDEN & OWENS for appellant.

J. M. ROBSION and POWERS, SAMPSON & SMITH for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellee, Joe Molner, aged 35, and with six years experience as a miner, was injured on April 16, 1909, by the fall of slate from the roof of appellant's mine in which Molner was then working as a "shooter." Molner was working under a contract, by which he received 60 cents a ton for the coal he "shot" down and loaded in cars; and, in doing this work, he employed four or five men to assist him. He had been working in this mine about five months before the accident occurred. There were three rooms or working places in which he was prosecuting his work. The coal would first be cut by the men who were operating the company's machines used for that purpose, and then "shot" down by Molner and his assistants and loaded by them on the cars. From the main entry which led from the mouth of the mine, a "haulway" led off to the three working places on the side where Molner and his men were engaged in removing the coal. This "haulway" was used by Molner and his men in going to their places of work, and was also the way through which the loaded cars were hauled, upon a railroad track, to the mouth of the mine.

About 7 or 8 o'clock on the morning of the accident, Molner and his men went to their work in one or more of the three working places above mentioned. The machine men were working in one of these places, while the "shooters" and loaders were in the others, loading and cleaning up the coal which had theretofore been "shot" down. Charles Trosper, the driver, who was an employe of the company, had taken out several loads through the "haulway" previous to the accident to appellee. Between 1 and 2 o'clock in the afternoon, Molner, for some reason not disclosed by the evidence, desiring to see Trosper, the driver, who, at the time, was at the mouth or outside of the mine, left the place where he was working and started in search of the driver, going down the "haulway" towards the mouth of the mine. When he had gone perhaps half of the distance, he found a quantity of slate had fallen from the roof on to the car track below. When Molner discovered the fallen slate on the track, he passed it, with the intention of meeting and stopping the returning driver. He met Trosper a short distance beyond the slate, and had him stop his mule and car and wait until the slate could be removed. Molner then went back to his working place and returned, bringing with him two miners, Jake Smith and George Hembree, to assist him in removing the slate. Pursuant to Molner's direction, one of the men brought a large hammer for the purpose of breaking the slate, and the other brought a shovel with which to remove it. They proceeded to break the slate and remove it from the track, Smith using the hammer, Hembree the shovel, and Molner working with his hands. The "haulway" was about 6 feet high, and 18 feet wide. Smith was using the hammer in breaking the slate; and, raising the hammer too high, he struck the roof above from which the slate had fallen. Smith remarked that the roof sounded "drummy" and loose; and said to Molner and Hembree that the roof was dangerous and likely to fall. Trosper the driver, who was waiting nearby, heard the hammer as it struck the roof, and also heard Smith's warning. According to the testimony of Hembree and Smith, Molner struck the roof above with his hand, and said, "Maybe all fall tonight." Molner was an experienced miner, and his remark was evidently taken by his companions to mean that there was a probability of the slate

falling later, but that there was no immediate danger. Smith, Hembree and Molner then proceeded with the work of removing the slate; but Smith, who still had his fears as to the safety of the place, again looked up, and as he did so, he saw the slate begin to tear loose and fall. He imediately called to Molner and Hembree to look out, that the slate was falling, and as he ran by Hembree a large quantity of the slate fell, catching and injuring both Molner and Hembree. Molner's right leg was broken in two places, resulting in it becoming two inches shorter than his left leg; he was confined to his bed for more than two months, and had to use crutches three months thereafter. He was severely and permanently injured. Molner denied that he examined the roof or struck it with his hand, or that he made the remark that it might all fall by night, but in this he is contradicted by both Hembree and Smith. Upon a trial he obtained a judgment for $9,000; and the company prosecutes this appeal. The defense consists of a traverse of the charge of negligence, and a plea of contributory negligence upon Molner's part.

Many grounds are assigned for a reversal; but, according to our view of the case, it is only necessary to review one of them, and that is, whether the court should have sustained appellant's motion for a peremptory instruction for the jury to find for the defendant.

The reciprocal duties of the mine owner and the miner are stated, in Ashland Coal & Iron Railway Co. v. Wallace, 101 Ky., 637, to be as follows:

"It is the duty of the mine owner to exercise ordinary care to provide a reasonably safe place in which his employe may perform his work, and he must use diligence to keep this place in a reasonably safe condition so that the servant may not be exposed to unnecessary risk; and this diligence must be commensurate with the character of the service required and with the dangers that a reasonably prudent man would apprehend under (the) circumstances of each particular case. A greater degree of care is required of the master who places his servant at work in a coal mine, beneath overhanging masses of rock which are liable to fall at any moment, than one who places his servant where such danger is not to be apprehended. A prudent man would exercise greater care and watchfulness in the former than in the

latter case; and the greater the danger a prudent man would apprehend the higher the degree of care and diligence are required of the master in the protection of the servant. For a failure to exercise this care, resulting in an injury to the servant, the master is liable, and this duty and liability. extend not only to the unreasonable and unnecessary risks that are known to the master, but also to such as a reasonably prudent man in the exercise of ordinary diligence—diligence proportionate to the risk—would have known or discovered. (Cook v. Railway Co., 34 Minn., 45; 24 N. W. Rep., 113; Noyes v. Smith, 28 Vt., 59; Gigson v. R. R. Co., 46 Mo., 163; Jones v. L. & N. R. R. Co., 95 Ky., 576; Flahiff v. L. & N. R. R. Co., 9 Ky. Law Rep., 398; Lawrence v. Hagemeyer, 93 Ky., 591; Union Pacific R. R. Co. v. Jarvi, 53 F. R., 65.)

"And whilst the employer cannot be held bound as an insurer of the safety of the place in which he puts his servant, he is, in every case, bound to exercise that care and diligence proportionate to the occupation which a reasonably prudent man would use under like circumstances, both to provide and keep in a reasonably safe condition the place of work; and this duty is personal to the master, and cannot be so delegated as to relieve him of liability. (Railway Co. v. Herbert, 116 U. S., 642, 648 and 652.)

"On the other hand, it is the duty of the servant to exercise that degree of care which is commensurate with the character of his occupation, which a reasonably prudent person would use under like circumstances, in order to protect himself from injury; and if he fails to exercise this care he cannot recover of the master for an injury to which his own negligence has contributed, even though the master has failed to exercise due care on his part. He cannot recklessly expose himself to a known danger and to a danger which an ordinarily prudent and intelligent man would, in his situation, have apprehended, and then recover of the master for an injury which his own carelessness has caused. (Cunningham v. Railway Co., 17 Fed. Rep., 882, 886; D'Lozier v. Ky. Lumber Co., 13 Ky. Law Rep., 818; L. & N. R. R. Co. v. Shivell, 13 Ky. Law Rep., 902; Doyle v. Swift's Iron and Steel Works, 5 Ky. Law Rep., 59; Bunt v. Mining Co., 138 U. S., 483, 485; R. R. Co. v. Jones, 95 U. S., 439, 443; Kane v. Ry. Co. 128 U. S., 91, 94.)"

Applying these rules to the undisputed facts—and by that we mean the physical facts and Molner's testimony relating to them—what do we find? .

Molner is an Hungarian, and had been living in the United States some nine years. He was an experienced and high salaried miner, earning from $150 to $250 per month. He speaks English with great difficulty, and gave the larger portion of his testimony through an interpreter. When asked whose duty it was to remove slate that had fallen upon the track, he said it was his duty when the amount was small, and the company's duty when the amount was great. There is no other evidence upon that subject. And, when asked what amount of slate he found upon the track, and which he had attempted to remove, Molner said it was about 40 pounds, and covered 12 feet of the track. On the other hand, Hembree and Smith say there was about a car load of the slate, and that it would weigh anywhere from 1,800 pounds to 3,000 pounds, or more.

If the dangerous condition of the roof at the time and place of the accident was so threatening and imminent that it presented a monitory and cautionary significance and warning, which one could not have overlooked in the exercise of ordinary care, Molner was guilty of such contributory negligence that caused his own injury, and he cannot recover. Undoubtedly appellant owed Molner the duty to use ordinary care in furnishing and maintaining for him a reasonably safe place in which to work, but it cannot be said that the evidence shows that the appellant failed in this respect. Appellee attempted to show that appellant had failed to properly inspect the mine, but the proof upon this subject is not sufficient, either in quantity or in character to warrant that conclusion. It is negative in character; and, although it was appellant's duty to properly inspect its mine, and it may have failed to do so, nevertheless, it is not liable for appellee's injuries, if they were brought about by his own negligence. Wilson v. Alpine Coal Co., 118 Ky., 463.

It will be noted that Molner was injured by the second fall of the slate, and not by the first fall. It is not unusual for slate to fall from the roof of a mine for many reasons, and most unexpectedly. The record fails to show that any of appellant's employes either knew that this slate had fallen, or that they had any reason to

suspect that it might have fallen. Trosper, the driver, had been using the "haulway" throughout the day; and, as he had passed through it only a short time before in carrying a load of coal to the mouth of the mine, it necessarily follows that the slate had fallen quite recently, and after Trosper had passed that point. Molner was not only the first man to discover that the slate had fallen, but the nature and the extent of the deposit, and the conditions under which he undertook to remove it, necessarily conveyed full notice to him that the roof was dangerous, and likely to fall at any moment. He made no complaint to any of appellant's employes or bosses; on the contrary, he voluntarily undertook to remove the slate himself.

It is elementary law that the servant is bound to use his eyes to see that which is open and apparent to any person using his eyes; and, if the defect is obvious and suggestive of danger, the knowledge on the part of the servant will be presumed as well as where the dangers are subject of common knowledge.

In White's "Personal Injuries in Mines," section 153, it is said:

"Even the most ignorant workmen, if not of impaired intelligence, are conclusively presumed to know the effect and operation of natural laws, and certainly when the law presumes a knowledge of its own shifting doctrines, a familiarity with the immutable laws of nature ought to be conclusively presumed on the part of every creature subject to those laws."

And again, the same author, in section 404, says:

"The knowledge, or means of knowledge, on the part of an employe of a defective condition of a roof in a mine is often of great importance in determining whether or not he assumed the risk of injury therefrom. Generally, where an employe has equal or superior means of information, to that of his employer, he is held to assume the risk, and this is the rule with reference to a defective roof in a mine; and, if the defect is obviously suggestive of danger, the knowledge of danger is legally presumed, upon the employe's part."

And, in Sherman & Redfield on "Negligence," section 217, the rule is stated as follows:

"When circumstances make it the duty of the servant to inquire, it is contributory negligence on his part

not to inquire. A servant is chargeable with actual notice of every fact which he would have known, had he exercised ordinary care to keep himself informed as to the matters concerning which it was his duty to inquire; and especially should this rule be applied where the servant's action is founded upon the assumption that the master ought to have known of something which he did not actually know."

In Shemwell v. Owensboro & Nashville R. R. Co., 117 Ky., 562, Shemwell was the keeper of a water tank and pumping house for the railroad company, his principal duty being to operate the engine that pumped water into a large tank from which the locomotives were supplied. The smoke stack of the boiler connected with his engine became so out of repair that it deflected sparks on to the roof of the building in which the engine was situated, setting fire to the roof; and, in going upon the roof to put out the fire, it fell by reason of its rotten condition, and injured Shemwell. In denying him any right to recover under those circumstances, we had this to say:

"Negligence is the failure to do something that the doer, in the exercise of ordinary care, should have done. The employer's duty in this case, it is claimed for appellant, was primarily to furnish him a safe, or at least a reasonably safe, place in which to do his work. With certain recognized limitations this will be accepted. * * * Among these limitations are these: If the laborer knows of the defective condition of the premises, or if their condition is so obvious that he could have known of it by the exercise of ordinary care on his part, he assumes the risk of injury arising from such defect. The promise of the employer to repair will be noticed further along. But in no state of case is the employer an insurer of the safe condition of his premises. His undertaking is only an implied one. The defective condition must be such that the employer actually knew of it, or by the exercise of ordinary care on his part, or on the part of his servants in authority and in charge, could have known of it before he is liable therefor to a servant. The law imposes neither an impossible nor an unreasonable duty upon either the employer or the employe."

And, in Wilson v. Chess & Wymond Co., 117 Ky., 571, decided the same day, this same principle is re-announced, as follows:

"The duty of the master to furnish a safe, or reasonably safe, place in which the laborer may do his work, is frequently either misunderstood or misapplied. In the first place, the master is not required to furnish an absolutely safe place. If the work is in and of itself dangerous, the master does not insure against such danger. On the contrary, there is nothing better settled than that the servant assumes the ordinary risks and hazards incident to the character of his work. Whatever may be the moral obligation resting upon those who employ people in hazardous work to furnish them the safest possible means to protect them from injury, the law does not forbid a laborer's undertaking a hazardous employment with full knowledge of its dangers, if he wants to. If he does, the law leaves the risk upon him, for he has assumed it. There is no feature of the law of negligence better settled than this. The contrivance in use in this case was of the simpliest kind. It was merely a large vat or tub, plainly open at the top. The lowest order of intelligence of a rational man would have comprehended that boiling water would scald the flesh if it came in contact with it, and that ice was slippery. The conditions were openly visible to the laborer. He had only to use his eyes, and his most common experience, and his earliest instincts, to fully appreciate the danger of his position.

"There was no assurance by the master of the safety of the place, even if such assurance, under the circumstances, could have shifted the liability. There was no promise by the master to provide other appliances of greater safety—no promise to repair. Under these circumstances, the servant assumed the dangers of his employment. He cannot, therefore, recover from the employer damages growing out of them."

Duncan v. Gernert Bros. Lumber Co., 27 Ky. L. R., 1029, 87 S. W., 762; Hilman Land & Iron Co. v. Littlejohn, 28 Ky. L. R., 985, 90 S. W., 1053; Corley v. Paducah Cooperage Co., 28 Ky. L. R., 451, 89 S. W., 512; Carey v. Samuels & Co., 139 Ky., 623, recognize and apply the same principles.

Molner says he did not look up, but looked down; that he didn't want to see anything; that he only wanted to take the slate so he could let the car come in. Giving to Molner's evidence the weight which is proper by reason of his inability to speak the English language, it

amounts to this: He was the first to discover that the slate had fallen; and, being an experienced miner, he knew its full meaning; and yet, in face of what must have appeared to him to be an impending danger from a second or a succeeding fall of slate from the same place, and without reporting it to the mine owner, or attempting to prop the roof to prevent other slate from falling, he went to work at once beneath the place from which the slate had just fallen, and almost immediately he was injured by the second fall. Under such circumstances can it be said that Molner was not guilty of such contributory negligence that the injury would not have been received without it? In our opinion, this regretable accident was brought about by Molner's own negligence, which is so apparent as to leave no other conclusion to be deduced from the facts. The danger was so obvious and imminent that a person of ordinary prudence, under like circumstances, would not have subjected himself to it; and, that being true, appellant cannot recover. Louisville Gas Co. v. Fry, 147 Ky., 757. The miner cannot shut his eyes to obvious dangers, and then charge the consequence upon his master. Low v. Clear Creek Coal Co., 140 Ky., 754, Ann. Cas., 1912, B., 575.

This case is not to be adjudged by Huddleston's Admr. v. Straight Creek Coal & Coke Co., 138 Ky., 512, and cases of that class, in which there was no question of contributory negligence. We do not rest the decision of this case upon the fact that appellant fully performed its duty in inspecting its mine, but upon the undeniable facts which show that appellee was guilty of such contributory negligence as would defeat a recovery. L. & N. R. R. Co. v. Mounce's Admr., 28 Ky. L. R., 933, 90 S. W., 956; Hall v. L., H. & St. L. Ry. Co., 31 Ky. L. R., 853, 104 S. W., 275; C., N. O. & T. P. Ry. Co. v. Yocum's Admr., 123 S. W., 247.

Under the facts shown by this record, the trial court should have peremptorily instructed the jury to find for the defendant.

Judgment reversed for further proceedings.